O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ROSALIE J. BARBER,          ) Case No. EDCV 12-1914-JPR
                            )
                 Plaintiff, )
                            )
          vs.               ) MEMORANDUM OPINION AND ORDER
                            ) AFFIRMING COMMISSIONER
CAROLYN W. COLVIN, Acting   )
Commissioner of Social      )
Security,[1]                )
                            )
                 Defendant. )
                            )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision
denying her applications for disability insurance benefits
("DIB") and supplemental security income benefits ("SSI").  The
parties consented to the jurisdiction of the undersigned U.S.
Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is
before the Court on the parties' Joint Stipulation, filed
September 4, 2013, which the Court has taken under submission

_____

     [1]     On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

1

without oral argument.  For the reasons stated below, the
Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on May 22, 1958.  (Administrative Record
("AR") 156.)  She completed high school and some college.  (AR
41, 252.)  She previously worked as a childcare worker and
supervisor of special-needs adults.  (AR 159, 171, 183.)

On August 5, 2009, Plaintiff filed applications for a period
of disability,[2] DIB, and SSI.  (See AR 141-42, 156.)  She alleged
that she had been unable to work since July 28, 2008, because of
injuries to her back, neck, and left shoulder, leg, and foot;
constant pain in her lower back and spine, neck, left side, and
shoulder; headaches; sleep impairment; and grief and depression.
(AR 156, 170.)

After Plaintiff's applications were denied, she requested
reconsideration.  (See AR 76.)  They were again denied, after
which she requested a hearing before an ALJ.  (See AR 77-78.)  A
hearing was held on April 20, 2011, at which Plaintiff, who was

---

[2]      An individual who applies for DIB after the expiration
of her insured status must show that the disability existed
before the date upon which her insured status lapsed and has
continued since.  Cf. Flaten v. Sec'y of Health & Human Servs.,
44 F.3d 1453, 1457 (9th Cir. 1995) ("[A]n individual cannot
receive disability benefits for a recurrence of a disability
. . . unless the individual can establish that the current period
of disability began on or prior to the expiration of insured
status." (emphasis omitted)).  Plaintiff appears to have thought
that her insured status had lapsed and sought to establish a
continuous period of disability dating to before the lapse.  The
ALJ properly noted, however, that Plaintiff's earnings record
showed that she had acquired sufficient quarters of coverage to
remain insured through December 31, 2013 (AR 19; see AR 156), so
she needed only to establish disability on or before that date.
42 U.S.C. § 423.

represented by counsel, appeared and testified, as did a
vocational expert ("VE") and medical expert Dr. Samuel Landau.
(AR 37-60.)  In a written decision issued April 29, 2011, the ALJ
determined that Plaintiff was not disabled.  (AR 19-31.)  On
August 20, 2012, the Appeals Council denied her request for
review.  (AR 4-6.)  This action followed.

**III.  STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review
the Commissioner's decision to deny benefits.  The ALJ's findings
and decision should be upheld if they are free of legal error and
supported by substantial evidence based on the record as a whole.
Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420,
1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746
(9th Cir. 2007).  Substantial evidence means such evidence as a
reasonable person might accept as adequate to support a
conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue,
504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla
but less than a preponderance.  Lingenfelter, 504 F.3d at 1035
(citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.
2006)).  To determine whether substantial evidence supports a
finding, the reviewing court "must review the administrative
record as a whole, weighing both the evidence that supports and
the evidence that detracts from the Commissioner's conclusion."
Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the
evidence can reasonably support either affirming or reversing,"
the reviewing court "may not substitute its judgment" for that of
the Commissioner.  Id. at 720-21.

3

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively

4

presumed and benefits are awarded.   §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).   If the claimant's impairment or combination
of impairments does not meet or equal an impairment in the
Listing, the fourth step requires the Commissioner to determine
whether the claimant has sufficient residual functional capacity
("RFC")[3] to perform her past work; if so, the claimant is not
disabled and the claim must be denied.   §§ 404.1520(a)(4)(iv),
416.920(a)(4)(iv).   The claimant has the burden of proving that
she is unable to perform past relevant work.   Drouin, 966 F.2d at
1257.   If the claimant meets that burden, a prima facie case of
disability is established.   Id.   If that happens or if the
claimant has no past relevant work, the Commissioner then bears
the burden of establishing that the claimant is not disabled
because she can perform other substantial gainful work available
in the national economy.   §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
That determination comprises the fifth and final step in the
sequential analysis.   §§ 404.1520, 416.920; Lester, 81 F.3d at
828 n.5; Drouin, 966 F.2d at 1257.

     B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since July 28, 2008.   (AR 21.)
At step two, he concluded that Plaintiff had severe impairments
of morbid obesity with treated obstructive sleep apnea,
degenerative joint disease of the left foot and knee, chronic
sprain of the left shoulder, degenerative disc disease and

---

     [3]   RFC is what a claimant can do despite existing
exertional and nonexertional limitations.   §§ 404.1545, 416.945;
see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1   arthritis of the neck and back, and headaches.  (Id.)  He
2   determined that her hypertension and mood disorder were not
3   severe.  (AR 22.)  At step three, the ALJ determined that
4   Plaintiff's impairments did not meet or equal any of the
5   impairments in the Listing.  (AR 24.)  At step four, he found
6   that she retained the RFC to perform a range of "light work."
7   (Id.)  Based on the VE's testimony, the ALJ concluded that
8   Plaintiff could not perform her past work as a special-needs aide
9   or childcare worker.  (AR 30.)  At step five, he concluded that
10  she was not disabled under the framework of the Medical-
11  Vocational Guidelines, 20 C.F.R. part 404, subpart P, appendix 2
12  ("the Grids"), and that jobs existed in significant numbers in
13  the national economy that she could perform.  (AR 30-31.)
14  Accordingly, the ALJ determined that Plaintiff was not disabled.
15  (AR 31.)

16  **V.    RELEVANT FACTS**

17       A.    Medical Records

18       Plaintiff reported that in March 2004, she tripped while
19  working and injured a bone in her left foot.  (See AR 274; but
20  see AR 360 (citing different date, noting possibly not work
21  related).)  She had surgery on her left foot on November 11,
22  2004.  (See AR 476.)  She reinjured her foot when she again
23  tripped at work sometime in 2005.  (AR 360.)  She was treated
24  with a boot but reported in April 2009 that her foot had never
25  improved.  (Id.)  There are no medical records reflecting these
26  injuries and treatments, only descriptions of them in later
27  medical reports.  March 14, 2005 x-rays of Plaintiff's left ankle
28  and foot were normal.  (AR 244-45.)

On October 13, 2006, Plaintiff sustained a workplace injury when a chair collapsed beneath her.  (See AR 275, 357, 518.)  The following morning, she began to experience headaches and stiffness in her back and left leg, and she missed the next two days of work because of pain.  (See AR 358.)  She went to her employer's clinic for evaluation and treatment, where she was x-rayed, given pain medication, and taken off work duty.  (See AR 275, 358.)  She returned to light duty a couple of days later and, after a short period of time, resumed her normal duties. (See AR 275, 358.)  Her back, neck, and leg pain and headaches continued, and her symptoms grew worse.  (See AR 275, 358.)  As her physical condition deteriorated, she began to suffer anxiety and difficulty sleeping.  (AR 275.)  Because her symptoms did not improve, sometime in 2007 she sought the advice of an attorney (id.), who filed a workers' compensation claim on her behalf. There are no records of Plaintiff's initial treatment for the October 2006 injury; most of the medical evidence in the record pertains to her later workers' compensation claim.

On January 22, 2008, Dr. Nelson J. Flores, Ph.D., a licensed and board-certified clinical psychologist, prepared a consultation report at the request of Plaintiff's attorney.  (AR 274.)  Plaintiff reported difficulty sleeping through the night, a sad and anxious mood, intense and frequent headaches, and nervousness sometimes accompanied by a sensation of warmth, dizziness, numbness, weakness, and trembling.  (AR 277.)  Dr. Flores subjected Plaintiff to "[a] battery of psychological tests" and reviewed her medical file.  (AR 278-79.)  He diagnosed

dysthmia,[4] anxiety, and sleep disorder and opined that these were "directly related" to her 2006 injuries. (AR 279.) He recommended psychotherapy and deemed Plaintiff's prognosis "guarded." (AR 280.) He did not express an opinion as to Plaintiff's work status for workers' compensation purposes. (See AR 268-69.)

On January 28, 2008, Plaintiff was seen by chiropractor Justin Long for complaints of neck, low-back, left-shoulder, and left-knee injuries related to her 2006 workplace injury. (AR 601.) She described intermittent neck pain, rating it a "4" on a scale from zero to 10; intermittent low- and middle-back pain radiating through her left leg and foot, rating it a "9"; occasional left-shoulder pain and swelling, rating it a "7"; intermittent left-leg pain, rating it an "8" or "9"; difficulty sleeping; and stress. (AR 602-03.) Long noted tenderness and muscle spasms in Plaintiff's cervical, thoracic, and lumbosacral spine and range of motion between 75% and 90% of normal. (AR 605-06.) He noted somewhat limited range of motion in her left shoulder and pain in both shoulders with range-of-motion testing. (AR 606.) Plaintiff was positive for Apley's test[5] on the left.

---

[4] Dysthmia is a type of chronic depression in which a person's moods are "regularly low." See Dysthmia, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/ (last updated Sept. 17, 2012).

[5] Apley's test is used to diagnose damage to the meniscus. See Michael D. Chivers & Scott D. Howitt, Anatomy and Physical Examination of the Knee Mensici: A Narrative Review of the Orthopedic Literature, J. Can. Chiropr. Assoc. 319, 323 (2009), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2796951/pdf/jcca-v53-4-319.pdf.

(Id.)  Her sensation and motor strength were intact in her upper extremities.  (Id.)  He noted hypoesthesia[6] along her lumbosacral vertebrae but found her lower extremities otherwise normal.  (AR 606-07.)

Long diagnosed cervical and lumbar radiculitis,[7] cervical and thoracolumbar segmental dysfunction, left-shoulder pain, insomnia, and stress.  (AR 607.)  He prescribed a course of phsyiotherapy and chiropractic care, home exercise, acupuncture, a work-conditioning program,[8] a TENS unit, and "supplies for home use."  (AR 607-08.)  He referred her for MRI studies of the cervical, thoracic, and lumbar spines and left shoulder and a nerve conduction velocity study.[9]  (AR 608.)  He also referred her for a pain-management evaluation and to a psychologist.  (Id.)  He noted that "patient is to return to regular job duties."  (AR 611.)

On April 2, 2008, psychiatrist Dr. James E. O'Brien

---

[6]    Hypoesthesia is diminished sensitivity to stimulation.  See Stedman's Medical Dictionary 856, 860 (27th ed. 2000).

[7]    Radiculitis, or radiculopathy, is a disorder of the spinal nerve roots.  See id. at 1503.

[8]    Work-conditioning programs aim to restore an injured individual's physical capacity and function to enable her to return to work.  See, e.g., Work Hardening vs. Work Conditioning – The Basics, PRORehab P.C. Blog (Mar. 5, 2012), http://www.prorehabpc.com/blog/2012/3/5/work-hardening-vs-work-conditioning-the-basics.aspx; Work Hardening & Work Conditioning, Active Body Clinic, http://www.activebodyclinic.com/services/training.html (last visited Dec. 27, 2013).

[9]    A nerve conduction velocity test sees how fast electrical signals move through a nerve.  See Nerve conduction velocity, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003927.htm (last updated June 18, 2011).

9

performed a thorough psychiatric examination of Plaintiff in connection with her workers' compensation claim. (AR 246, 249.) Plaintiff reported depression and anxiety arising from a work-related injury. (AR 248-49.) Dr. O'Brien reported that she was mildly depressed and anxious and that her concentration was "subjectively impaired"; but her intelligence and thought processes were normal and her judgment good. (AR 255-56.)

Plaintiff reported that her primary-care physician deemed her disabled in July 2008. (See AR 40, 478.) The record contains Off Work Authorizations from Dr. John R. Shaw, a family practitioner, covering the period from July 24, 2008, to February 27, 2009. (See AR 725, 727, 729, 730-32.) Chiropractor Long reported that Plaintiff was temporarily totally disabled from August 3, 2009, to July 5, 2010. (See AR 583, 585, 588, 590, 592, 596, 600.) Primary Treating Physician Progress Reports note such findings as limited range of motion in her cervical and lumbar spines and left hip, knee, and ankle; swelling in her left knee; and sensory loss in her upper and lower extremities. (See, e.g., AR 584.) Chiropractor Jerilynn Sue Kaibel, possibly affiliated with Dr. Shaw (see AR 729), provided Off Work Authorizations excusing Plaintiff from work from October 28, 2008, through February 27, 2009 (see AR 723, 724, 726, 728).

From September 10, 2008, through November 9, 2009, Plaintiff was seen by chiropractor Kaibel for treatment of injuries sustained in an August 2008 car accident. (See AR 347; see generally AR 317-48.) On September 10, 2008, Plaintiff's symptoms were reported to include pain and stiffness in her neck and back, left-foot pain, difficulty with prolonged standing and

10

walking, and difficulty sleeping.  (AR 347.)  Kaibel's examination of Plaintiff revealed pain and spasm in her cervical, lumbar, and trapezoidal muscles and restricted range of motion in her cervical and lumbar regions.  (Id.)  Cervical compression, shoulder depression, Kemp's,[10] straight-leg raise, double straight-leg raise, and Ely[11] tests were positive.  (Id.)  Kaibel diagnosed cervical, thoracic, and lumbosacral sprain or strain, myalgia, headache, and left-foot strain.  (Id.)  Plaintiff was to be treated with "mild mobilizing spinal manipulation," soft-tissue massage, ultrasound, and home stretching exercises.  (Id.)

Although Kaibel's records reflect Plaintiff's consistent complaints of pain and stiffness in her neck and back, she reported improvement in her symptoms beginning in October 2008. (See AR 335-36, 339-41; see also AR 318-19, 322, 324, 326-28, 333.)  On January 9, 2009, Kaibel reported that Plaintiff had been "released from active care" but advised to contact the office in case of "significant" "exacerbation."  (AR 321.) Plaintiff reported continued pain and stiffness in her neck and back at a February 2, 2009 visit.  (AR 317.)

---

[10]   The Kemp's test is a means to detect disc protrusion causing radiating pain.  See Kenneth Jeffrey Miller, Physical Assessment of Lower Extremity Radiculopathy and Sciatica, J. Chiropr. Med. 75, 77 (Apr. 3, 2007), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647081/pdf/main.pdf.

[11]   The Ely, or Duncan-Ely, test is a clinical tool to assess spasticity of the rectus femoris quadriceps muscle.  See M.C. Marks et al., Clinical Utility of the Duncan-Ely Test for Rectus Femoris Dysfunction During the Swing Phase of Gait, Dev. Med. & Child Neurology 763, 763 (2003), available at http://onlinelibrary.wiley.com/doi/10.1111/j.1469-8749.2003.tb008 86.x/pdf; Stedman's Medical Dictionary, supra, at 1154, A22.

On April 24, 2009, orthopedic surgeon Dr. Brent W. D'Arc performed a Qualified Medical Examination of Plaintiff.[12]  (AR 357.)  Dr. D'Arc noted Plaintiff's primary complaints of frequent moderate pain, occasional severe pain, swelling, and decreased motion in her left foot.  (AR 358.)  Plaintiff also complained of headaches occurring approximately four times a week, rating the pain as a "seven" on a scale of zero to 10.  (Id.)  She reported "diffuse low back pain" when she attempted to bend or grab things or when she sat too long, such as on long car rides.  (AR 358-59.)  The pain was worse in cold temperatures.  (AR 359.)  She reported no neurologic changes in her lower extremities.  (Id.)  Plaintiff reported pain from turning her neck that occurred about three times a week and occasional neck pain when she lay down to sleep.  (Id.)  She denied any weakness, neurologic changes in her upper extremities, or clumsiness with her hands.  (Id.)  Plaintiff reported stiffness and muscular tightness in her left shoulder and arm but denied any related neurologic changes.  (Id.)  Plaintiff reported that she had trouble sleeping because of back pain.  (Id.)

In a daily-activities questionnaire, Plaintiff described difficulty with walking, stairs, lifting, prolonged sitting, overhead activities, pushing, pulling, and forceful activities.  (Id.)  She was unable to kneel, squat, or bend.  (Id.)  She noted

---

[12]     Such exams and "medical-legal reports" assist the California Division of Workers' Compensation in determining injured workers' eligibility for benefits.  See DWC Qualified medical evaluator (QME) process, Cal. Div. of Workers' Comp., http://www.dir.ca.gov/dwc/medicalunit/ QME_page.html (last updated Oct. 2013).

trouble sleeping, depression, and anxiety because of her injuries.  (Id.)

Upon physical examination, Dr. D'Arc reported "full active range of motion" of Plaintiff's cervical spine but "pain associated with movement in all directions."  (AR 362.)  He also noted diffuse tenderness in the back of her neck and along the vertebral column.  (Id.)  Plaintiff demonstrated diffuse bony and muscular tenderness in her lumbar region but full active range of motion and no spasm.  (AR 363.)  Plaintiff walked without assistance or a limp and had only minimal trouble getting on and off the exam table.  (Id.)  She demonstrated full strength and sensation in her upper and lower extremities.  (AR 362-63.)

X-rays revealed "mild degenerative changes" of the lumbar spine "evidenced by decreased disc space and sclerosis at the L5/S1 level," "mild degenerative changes" of the cervical spine "evidenced by osteophyte formation at the C5 and C6 level," and "mild scoliosis."  (AR 364.)  Dr. D'Arc noted "no evidence of instability" in the lumbar spine and "good alignment of all articulations" in the cervical spine.  (Id.)  Images of Plaintiff's left shoulder were normal.  (Id.)  Images of her left ankle were normal except for "possible chronic ossifications at the distal tip of the medial malleolus."  (Id.)  Images of her left foot showed "moderate degenerative joint disease" but were otherwise normal.  (Id.)

Dr. D'Arc diagnosed arthritis in Plaintiff's foot, degenerative joint disease of the lumbar and cervical spines, left-shoulder contusion, and headache.  (AR 368.)  He found no work restrictions or loss of preinjury capacity.  (AR 370-71.)

13

On August 24, 2009, Dr. Eduardo E. Anguizola, a specialist in pain medicine, evaluated Plaintiff in connection with her workers' compensation claim.  (AR 517.)  He noted her complaints of intermittent "severe, stabbing, aching pain in the neck, radiating to the shoulders," which was "aggravated by bending, twisting, and turning"; intermittent "moderate, sharp, and burning pain in the lower back, radiating to the legs" and feet and "aggravated by prolonged walking, standing, sitting, bending, squatting, and climbing"; intermittent moderate pain in the left leg, extending from the thigh to the foot, including numbness and tingling and aggravated by prolonged standing and walking; and continuous moderate, throbbing, sharp pain in both shoulders, "radiating to the arms, with more intensity in the left side," with numbness and tingling in the hands and fingers and aggravated by lifting, carrying, overhead work, gripping, and grasping.  (AR 517-18.)  Plaintiff reported that she could sit for 15 minutes and walk for five to 15 minutes before needing to stop because of pain.  (AR 519.)  She reported taking Tylenol as needed for pain.  (AR 520.)

Dr. Anguizola noted reduced range of motion and tenderness in Plaintiff's cervical spine, lumbosacral spine, and shoulders.  (AR 522-23.)  Plaintiff was positive for supine straight-leg test at 20 degrees on both sides and for seated straight-leg test at 90 degrees on both sides.  (AR 523.)  Dr. Anguizola diagnosed neck pain, neck sprain or strain, depression, lumbar-spine sprain or strain, lumbar arthropathy,[13] and bilateral shoulder sprain or

---

[13]    Arthropathy is disease affecting a joint.  See Stedman's Medical Dictionary, supra, at 150.

strain.   (AR 523-24.)   He proposed a treatment plan including

blood-pressure treatment, referral for a psychological

evaluation, nerve conduction studies on her upper and lower

extremities, MRIs of the lumbar and cervical spine, continued

physical therapy, twice-daily application of capsaicin[14] and

ketoprofen[15] creams, twice-daily Zanaflex,[16] tramadol[17] as needed,

and omeprazole.[18]   (AR 524.)   He wished to reevaluate Plaintiff

in two months.   (AR 525.)

On September 1, 2009, an echocardiogram[19] showed mild

---

[14]   Topical capsaicin is used to relieve muscle and joint
pain.  See Capsaicin (On the skin), PubMed Health,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009431/?report=deta
ils (Dec. 1, 2013).

[15]   Ketoprofen is a nonsteroidal antiinflammatory drug used
to relieve pain, tenderness, swelling, and stiffness.  See
Ketoprofen, MedlinePlus,http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a686014.html (last updated Sept. 1, 2010).

[16]   Zanaflex is a brand name for tizanidine, a skeletal
muscle relaxant.  See Tizanidine, MedlinePlus, http://www.nlm.
nih.gov/medlineplus/druginfo/meds/a601121.html#skip (last updated
Feb. 11, 2012).

[17]   Tramadol is an opiate analgesic used to relieve pain
"around-the-clock."  See Tramadol, MedlinePlus, http://www.nlm.
nih.gov/medlineplus/druginfo/meds/a695011.html (last updated Oct.
15, 2013).

[18]   Omeprazole is used to treat the symptoms of
gastroesophageal reflux disease, or GERD, "a condition in which
backward flow of acid from the stomach causes heartburn and
possible injury of the esophagus."  See Omeprazole, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html
(last updated Jan. 15, 2013).

[19]   An echocardiogram is a test that uses sound waves to
create a detailed moving image of the heart.  See Echocardiogram,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/
003869.htm (last updated May 23, 2011).

hypertrophy of the left ventricle walls,[20] pulmonary vein dilation, and sinus tachycardia[21] but was otherwise normal.  (AR 574.)

The same day, Plaintiff was seen by internist Dr. Michael Rudolph for evaluation of her blood pressure.  (AR 544.)  Her blood pressure was 164/116, and her pulse was 107 beats per minute.  (AR 546.)  Dr. Rudolph diagnosed hypertension.  (Id.)  He switched her medication to benazepril and hydrochlorothiazide,[22] prescribed a blood-pressure cuff, ordered an electrocardiogram ("EKG") and echocardiogram, and asked her to return in two weeks.  (Id.)  When Plaintiff returned on October 27, 2009, for review of her tests, Dr. Rudolph increased her benazepril dose.  (AR 543.)  On March 16, 2010, he directed her to continue with her current medications and return in two months.  (AR 539-40.)

On September 10, 2009, an MRI of Plaintiff's left shoulder showed "[m]oderate supraspinatus tendinosis."[23]  (AR 564.)  An

---

[20]    Hypertrophy denotes a thickening of the ventricle wall. See Stedman's Medical Dictionary, supra, at 857.

[21]    Sinus tachycardia is rapid heartbeat originating in the sinus node.  See id. at 1782.

[22]    The combination of benazepril and hydrochlorothiazide is used to treat high blood pressure.  See Benazepril and Hydrochlorothiazide, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a601025.html (last updated Oct. 15, 2012).

[23]    Tendinosis is a degenerative lesion within the tendon. See Christopher Kaeding & Thomas M. Best, Tendinosis: Pathophysiology and Nonoperative Treatment, Sports Health 284, 284 (July 2009), available at http://www.ncbi.nlm.nih.gov/pmc/ articles/PMC3445129/#__ffn_sectitle; see also id. at 285 (distinguishing tendinosis from other tendon pathologies,

MRI of her left knee was normal.  (AR 566.)  An MRI of the lumbar spine showed disc desiccation; "a caudally dissection disc extrusion that abuts the thecal sac"; mild to moderate spinal-canal narrowing and mild neuroforaminal narrowing,[24] encroaching on the nerve roots; facet arthropathy; and a right unilateral sacralization.  (AR 569-70.)

On September 12, 2009, an MRI of Plaintiff's thoracic spine showed disk desiccation and mild spinal-canal and neuroforaminal narrowing.  (AR 554.)  An MRI of her cervical spine showed disc desiccation; a "posterior disc protrusion that effaces the spinal cord"; hypertrophy of the uncovertebral joints and left neural foraminal narrowing; and a "circumferential disc bulge that effaces the thecal sac."  (AR 557.)

On October 26, 2009, pain specialist Dr. Anguizola again evaluated Plaintiff.  (AR 511.)  She reported some pain relief from the prescribed medications.  (AR 512.)  Dr. Anguizola reported that the range of motion in her cervical and lumbar spine had slightly decreased since the prior examination.  (AR 512-13.)  He noted continued tenderness in both the cervical and

---

including tendinitis).  The supraspinatus tendon is one of the tendons in the shoulder.  See Inflamed shoulder tendons, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/ imagepages/9855.htm (last updated July 6, 2011).

[24]    Foramen, or foramina, are apertures or perforations through a bone or a membranous structure.  Stedman's Medical Dictionary, supra, at 698.  Narrowing of the spinal foramen, which house the nerves comprising the spinal cord, can place pressure on these nerves and cause pain, numbness, and weakness. See Spinal Stenosis, PubMed Health, http://www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0001477/ (last updated June 7, 2102); Herniated Disk, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0001478/ (last updated Apr. 16, 2013).

17

lumbar regions.  (AR 513.)  He adhered to his prior diagnoses and treatment plan and requested reevaluation in six weeks.  (AR 514.)

On October 28, 2009, chiropractor Brian Gonzales performed a Residual Functional Capacity/Work Assessment of Plaintiff at her primary-care physician's request.  (See AR 378-417.)  Gonzales noted mild restriction of her cervical and lumbar range of motion (AR 397-98) and slight weakness in her left shoulder (AR 399). He noted significant restrictions in her ability to squat, kneel, crawl, and lift.  (AR 405-06.)  Gonzales opined that Plaintiff could lift or carry 10 pounds occasionally; stand or walk less than six hours in an eight-hour day; sit less than six hours in an eight-hour day; and push or pull eight pounds occasionally. (AR 384.)  He stated that she could occasionally climb, balance, stoop, kneel, crouch, twist, and reach but could never crawl. (AR 385.)

On November 2, 2009, chiropractor Ronald S. Zecha evaluated Plaintiff's cervical, thoracic, and lumbar spines and her left upper and lower extremities in connection with her workers' compensation claim.  (AR 282.)  Based on clinical examination, imaging, and review of her medical records, Zecha provided both Diagnostic Related Estimate and Range of Motion assessments.[25] (See, e.g., id.; AR 288.)  He reported that Plaintiff exhibited muscle guardedness and complained of radicular pain in her

---

[25]     These are methods to evaluate spinal impairments in connection with California workers' compensation claims.  See Permanent Disability Rating at 2-3, Cal. Div. of Workers' Comp., available at http://www.dir.ca.gov/dwc/educonf16/PDRS/ PDRating.pdf (last visited Jan. 1, 2014).

cervical spine, but he found no objective evidence of radicular injury and little impairment to her cervical range of motion. (AR 283, 288.)  Zecha noted nonradicular pain with muscle spasm, guarding, and asymmetrical motion in Plaintiff's thoracic spine but only slightly decreased range of motion.  (AR 292, 296.)  He noted nonradicular pain with muscle guarding and asymmetrical motion as well as nonverifiable radicular symptoms in Plaintiff's lumbar spine.  (AR 300.)  He noted a slight decrease in lumbar range of motion.  (AR 304-05.)  Zecha found Plaintiff to have left-shoulder range of motion within normal limits.  (AR 309.) He found her left knee to have limited range of motion.  (AR 312.)  Zecha opined that her condition and function were not likely to change with treatment.  (AR 282, 291, 299, 308.)

On November 7, 2009, a comprehensive sleep study showed that Plaintiff suffered from severe obstructive sleep apnea and hypopnea,[26] "TachyBrady episodes,"[27] loud snoring, and significant

---

[26]   Obstructive sleep apnea is a common disorder that causes a person's airway to collapse or become blocked during sleep.   See Sleep Apnea, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/sleepapnea.html (last updated Sept. 30, 2013). Normal breathing begins again with a snorting or choking sound. Id.  Because sleep apnea interrupts sleep throughout the night, it can cause drowsiness and increased risk for accidents.   Id. Whereas apnea refers to airflow cessation, hypopnea indicates airflow reduction.   See Eric. J. Olson et al., Obstructive Sleep Apnea-Hypopnea Syndrome, Mayo Clinic Proceedings 1545, 1545 (Dec. 2003), available at http://download.journals.elsevierhealth. com/pdfs/journals/0025-6196/PIIS0025619611627511.pdf.

[27]   Bradycardia-tachycardia is characterized by alternating slow and fast heart rhythms.   See Sick sinus syndrome, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001214/ (last updated June 4, 2012).  Patients with bradycardia-tachycardia syndrome may be at higher risk of stroke.   See Sick sinus syndrome, Mayo Clinic, http://www.mayoclinic.com/health/

oxygen desaturation.  (See AR 452.)  During a second study, on
December 5, 2009, a continuous positive airway pressure ("CPAP")
device[28] was found to be "[w]ell tolerated" and was calibrated to
address severe obstructive hypopnea, "TachyBrady episodes," light
to moderate snoring, and moderate oxygen desaturation.[29]  (AR
453.)

On November 10, 2009, MRI scans of Plaintiff's left foot
showed "[o]steoarthritic changes . . . within the 1st
metatarsophalangeal joint" but were otherwise normal.  (AR 553.)

On November 16, 2009, Plaintiff was seen by Dr. Anguizola's
colleague, physician assistant Keith McGill.  (AR 422; see AR
572.)  His notes indicate that she had reached maximal medical
improvement[30] and that she would continue with her home exercise

---

sick-sinus-syndrome/DS00930/DSECTION=complications (last updated
May 20, 2011).

[28]   CPAP delivers slightly pressurized air during the
breathing cycle in order to keep the windpipe open during sleep.
See Nasal CPAP, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/ency/article/001916.htm (last updated July 31, 2011).

[29]   Oxygen desaturation refers to a drop in the blood
oxygen level.  See The Morning After: A Guide to Understanding
Your Sleep Study, Am. Sleep Apnea Ass'n, http://www.sleepapnea.
org/treat/diagnosis/sleep-study-details.html (last visited Dec.
17, 2013).

[30]   The California Division of Workers' Compensation
explains that maximal medical improvement ("MMI") indicates that
a claimant's "condition is well stabilized and unlikely to change
substantially in the next year, with or without medical
treatment."  See DWC Glossary of Workers' Compensation Terms for
Injured Workers, Cal. Div. of Workers' Comp., http://www.dir.ca.
gov/dwc/wcglossary.htm (last updated Apr. 2012).  Once a claimant
reaches MMI, her doctor can assess how much permanent disability
resulted from her work injury.  Id.

1  plan and prescriptions for tramadol, omeprazole, naproxen,[31] and

2  tizanidine.  (Id.; see also AR 179.)

3       On December 1, 2009, chiropractor Arlet Agazaryan and

4  certified Functional Capacity Technician Jeffrey A. Basurto

5  performed a Functional Capacity Evaluation of Plaintiff at the

6  request of her chiropractor, Long.  (AR 426, 445.)  Agazaryan

7  noted Plaintiff's limited range of motion with respect to right

8  and left lateral flexion and rotation of her cervical spine;

9  flexion of her lumbar spine; flexion, extension, abduction, and

10 internal rotation of her left shoulder; and flexion of her left

11 knee.  (AR 434-35.)  He noted Plaintiff's complaints of

12 significant pain with repetitive reaching, stooping, bending,

13 crouching, and twisting and her inability to complete all but one

14 of the repetitive testing activities.  (AR 435-37.)  He reported

15 that she displayed full physical effort during testing (AR 442)

16 and that his findings were consistent with Plaintiff's disability

17 based on self-assessment (AR 432).  Agazaryan found that

18 Plaintiff could sit for 30 minutes and stand for 20 minutes

19 before needing to shift or stretch and could carry and

20 occasionally lift less than six pounds but should avoid bending,

21 stooping, crouching, twisting, and activities at or above

22 shoulder level.  (AR 443.)

23      On December 15, 2009, orthopedist Dr. John Simmonds

24 evaluated Plaintiff at the request of the Department of Social

25

26

27      [31]   Naproxen is a nonsteroidal antiinflammatory drug, or
   NSAID, used to relieve pain, inflammation, fever, and stiffness.
28 See Naproxen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
   druginfo/meds/a681029.html (last updated Oct. 30, 2013).

Services.  (AR 475.)  He conducted a historical interview of Plaintiff, finding her to be of average reliability, and reviewed available medical documentation.  (Id.)  Her current medications were reported to include naproxen, tizanidine, tramadol, omeprazole, benazepril, Zoloft, tramadol cream, and ketoprofen. (AR 476.)  Dr. Simmonds noted that Plaintiff was able to "move about" and get on and off the examination table without assistance.  (AR 477.)  She did not limp.  (Id.)

Based on a physical examination of Plaintiff, Dr. Simmonds diagnosed mild to moderate degenerative disc disease of the cervical and lumbosacral spines and myofascial muscular pain of the upper and lower back.  (AR 478.)  He noted "painful range of motion in the neck and lower back with palpable tenderness along the paravertebral muscular groups" but no spasms, normal strength and sensation, and negative straight-leg-raise test.  (AR 477-78.)  Dr. Simmonds opined that Plaintiff could walk and stand for six hours a day; sit without restriction; push, pull, lift, or carry 50 pounds occasionally and 25 pounds frequently; bend, kneel, stoop, crawl, and crouch occasionally; and walk on uneven terrain, climb ladders, and work at heights occasionally.  (AR 478.)

On December 19, 2009, psychiatrist Dr. Jarvis B. Ngati evaluated Plaintiff at the request of the Department of Social Services.  (AR 480.)  Plaintiff reported taking Zoloft, undergoing psychiatric treatment, and participating in group therapy.  (AR 480-81.)  She reported that therapy had been helpful.  (AR 481.)  She was noted to have no trouble sleeping. (Id.)  She was reported to be "able to do household chores,

22

shop[], drive, cook, dress, and bath[e] herself." (Id.)  Dr.
Ngati noted Plaintiff's euthymic mood.[32]  (Id.)  He diagnosed
mild depression and psychosocial stressors.  (AR 482.)

On January 18, 2010, Dr. Anguizola reevaluated Plaintiff.
(AR 504.)  He noted that "without the medication [he had
prescribed], her quality of life would be severely interrupted."
(AR 505.)  Despite the medication, Plaintiff reported "mild"
"stabbing" neck pain with headaches occurring "part of the day, a
few days a week"; mild to moderate low-back pain radiating to her
left foot, accompanied by a burning sensation and occurring part
of every day; and mild to moderate left-shoulder pain.  (Id.)
The range of motion in her shoulder and cervical spine were
slightly improved.  (AR 506-07.)  Dr. Anguizola modified her
medications, including replacing ketoprofen with diclofenac.[33]
(AR 508.)  He suggested epidural steroid injections, which
Plaintiff said she would consider if her pain increased.  (Id.)

On January 20, 2010, Plaintiff was seen by orthopedist Dr.
Luigi F. Galloni for an evaluation of her left shoulder.  (AR
528-29.)  Dr. Galloni noted her complaints of continuous moderate
throbbing and sharp pain that radiated to her arm and tingling
and numbness in her left hand and fingers.  (AR 529-30.)
Plaintiff rated her pain as a "6 or 7" on a scale of zero to 10

---

[32]   Euthymia is a pleasant state of mind.  See Definition
of euthymia, Collins English Dictionary (10th ed. 2009),
available at http://dictionary.reference.com/browse/euthymia
(last visited Dec. 19, 2013).

[33]   Diclofenac is a nonsteroidal antiinflammatory drug used
to relieve pain, tenderness, swelling, and stiffness.  See
Diclofenac, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a689002.html (last updated Oct. 1, 2010).

and said that it was aggravated by lifting, carrying, overhead work, gripping, and grasping.  (AR 530.)  Physical examination revealed tenderness but full range of motion.  (AR 531.)  An impingement-sign test of Plaintiff's left shoulder was "mildly positive."  (Id.)  Imaging of the left shoulder revealed "slight narrowing of the acromioclavicular joint[34] and moderate supraspinatus tendinosis.  (AR 532-33.)  Based on his physical examination of Plaintiff and review of her records, Dr. Galloni diagnosed sprain or strain and supraspinatus tendinitis of the left shoulder.  (AR 536.)  He recommended "conservative modes of treatment," directing Plaintiff to continue home exercise and use of antiinflammatory medications and noting that more consistent pain might warrant subacromial injection.  (Id.)

On April 1, 2010, an MRI of Plaintiff's right knee showed mucoid degeneration within the posterior horn of the medial meniscus but was otherwise normal.  (AR 550.)

On June 8, 2010, Plaintiff was seen by dentist Mayer Schames for evaluation of "industrial related" dental issues.  (AR 660.)  After examination and diagnostic testing and review of her medical records, Dr. Schames diagnosed clenching and grinding of the teeth and bracing of the facial muscles, myofascial pain of the facial musculature, and inflammation of the temporomandibular joints.  (AR 579.)  He recommended an oral sleep appliance.  (AR 580.)  He opined that she was temporarily partially disabled and recommended that Plaintiff avoid activities that would aggravate her facial musculature.  (AR 684.)

---

[34]   The acromioclavicular joint joins the clavicle and the scapula.  See Stedman's Medical Dictionary, supra, at 18.

B.   <u>Written Submissions</u>

On December 4, 2009, Plaintiff completed a Function Report. (<u>See</u> AR 199-206.)  She reported that she cared for her grandson and helped him with his homework.  (AR 200.)  She noted her sleep disorder.  (<u>Id.</u>)  She said that she sometimes had trouble dressing and bathing herself and caring for her hair but was otherwise capable of personal care.  (<u>Id.</u>)  She noted that she sometimes needed special reminders to maintain personal care when depressed and that she needed to be reminded to take her medications.  (<u>Id.</u>)

Plaintiff stated that she prepared her own meals daily but that preparation of a "complete" meal could sometimes take three to four hours "because I have to stop and rest."  (AR 201.)  She noted that "standing too long" caused her leg, shoulder, and back pain.  (<u>Id.</u>)  Her need to stop and rest also affected her speed in completing housework.  (<u>Id.</u>)  She went out daily and was able to drive and shop for food and cleaning supplies.  (AR 202.)  Shopping, too, took a long time.  (<u>Id.</u>)  Plaintiff noted that depression interfered with her ability to complete housework and leave the house.  (AR 201-02.)

Plaintiff was able to pay bills, handle a savings account, and use a checkbook.  (<u>Id.</u>)  She noted, however, that her income had "stop[ped]."  (AR 203.)  She stated that her lack of income kept her from exploring any hobbies.  (<u>Id.</u>)  She did engage in social activities, including daily phone conversations and weekly visits to church, family, and her social group.  (<u>Id.</u>)  She sometimes needed accompaniment on those visits.  (<u>Id.</u>)

Plaintiff reported that her impairments affected lifting,

25

squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair-climbing, seeing, memory, completing tasks, concentration, understanding, following instruction, and using her hands. (AR 204.) She estimated that she could walk a block before needing to rest for about 30 minutes. (Id.) She stated that she could pay attention for about 20 minutes. (Id.) She reported that she did not finish what she started and did not follow written or spoken instructions very well. (Id.) She got along well with authority figures and had not been fired or laid off because of problems getting along with other people. (AR 205.) She noted that she did not handle stress or changes in routine very well. (Id.)

On the same day, Plaintiff's sister, Pearl Henry, submitted a Third Party Function Report. (See AR 191-98.) The report, although submitted by Henry on behalf of her sister, contains answers drafted in the first person and nearly identical to those in Plaintiff's Function Report. (Id.)

C.   Assessments of State Medical Consultants

On January 11, 2010, Dr. S. Lee, an ophthalmologist, completed a Physical Functional Capacity Assessment of Plaintiff. (AR 495.) Dr. Lee noted primary diagnoses of degenerative disc disease of the cervical and lumbar spines, left-shoulder tendinitis, and hypertension and a secondary diagnosis of left-knee pain. (Id.) Dr. Lee found that Plaintiff could lift 25 pounds frequently and 50 pounds occasionally, stand or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, and push and pull without limits. (AR 496.) She further noted that Plaintiff could never balance, could do only

26

limited reaching, and should avoid concentrated exposure to
extreme cold, vibration, and such hazards as machinery.  (AR 497-
98.)  Dr. Lee found Plaintiff's symptoms attributable to a
medically determinable impairment but found that the alleged
severity of symptoms was disproportionate to the evidence.  (AR
498.)

On January 11, 2010, Dr. R. Paxton, a psychiatrist, found
that Plaintiff had a medically determinable psychiatric
impairment but that it was not severe.  (AR 484, 487.)

On July 13, 2010, Dr. K. Loomis, a psychiatrist, affirmed
"the prior decision and Medium RFC dated 1/11/10," presumably,
the findings of both Drs. Lee and Paxton.  (AR 652.)

D.   Hearing Testimony

At the time of the hearing, Plaintiff was 52 years old.  (AR
41.)  She testified that she lived with and cared for her 14-
year-old grandson.  (AR 50.)  She had graduated high school and
completed some college.  (Id.)  She had last worked in a
childcare facility, a position she left July 28, 2008, on the
advice of her doctor.  (AR 40.)  She had not sought other work
since that time and relied for financial support on payments
received for foster care of her grandson.  (AR 41.)

Plaintiff testified that she could not walk far without her
leg "giving out."  (AR 46.)  She had driven to the hearing and
had difficulty walking from the parking lot to the building.
(Id.)  She estimated that she could stand for 10 minutes before
requiring rest.  (Id.)  She stated that she could sit for about
15 minutes before she became uncomfortable but could alleviate
discomfort by "shift[ing] to another side."  (Id.)  She was

27

1  unsure how many pounds she could lift but confirmed that she
2  could lift a gallon of milk.  (AR 47.)

3       Plaintiff testified that she struggled with bending,
4  stooping, and lifting because of pain in her lower back,
5  shoulders, and neck.  (Id.)  She also had difficulty lifting her
6  leg, for instance, to get into and out of the shower.  (Id.)  As
7  a result, such activities as house cleaning and grocery shopping
8  took a long time to complete.  (Id.)  She was still able to
9  prepare meals "sometimes" and did laundry with her grandson's
10 help.  (AR 50-51.)  She attended church about once a month.  (AR
11 51.)  She took only Tylenol for pain because she had no health
12 insurance, but she had recently qualified for Medicaid.  (AR 48.)

13      Plaintiff testified that she could not perform even a
14 sedentary job because of the pain in her lower back, leg, and
15 head and inability to sleep.  (AR 49.)  She estimated that the
16 pain was a "six" on a scale of one to 10.  (Id.)  She testified
17 that she suffered pain daily and that it came in periods lasting
18 about three hours.  (AR 50.)

19      Dr. Samuel Landau, a physician board certified in both
20 internal medicine and cardiovascular disease, appeared at the
21 hearing as a medical expert.  (See AR 41-45.)  Dr. Landau
22 testified that Plaintiff's medically determinable impairments
23 included "morbid obesity with treated obstructive sleep apnea,"
24 "degenerative joint disease of the left foot and knee," "chronic
25 sprain of the left shoulder," "degenerative disc disease and
26 degenerative arthritis of the neck and low back," headaches, a
27 psychiatric diagnosis, and "[l]abile hypertension."  (AR 42.)  He
28 noted that Plaintiff's hypertension was not severe.  (Id.)

Dr. Landau stated that Plaintiff's ailments did not meet a Listing.  (Id.)  He opined that her impairments would limit her to standing and walking for 15 to 30 minutes at a time for up to two hours in an eight-hour day; sitting for six hours in an eight-hour day with normal breaks every two hours and a provision to stand and stretch for one to three minutes each hour; and lifting and carrying up to 10 pounds frequently and 20 pounds occasionally.  (AR 42-43.)  He opined that she could occasionally stoop and bend and could climb stairs but not ladders.  (AR 43.)  She could not work at heights or in positions requiring balance.  (Id.)

Dr. Landau further stated that on her left side, Plaintiff would be limited to occasional work above shoulder level, operation of foot pedals, and operation of controls.  (Id.)  He stated that she required no such limitations on the right side.  (Id.)  Dr. Landau opined that Plaintiff could "do occasional neck motion, but should avoid extremes of motions."  (Id.)  He further noted that "[h]er head should be held in a comfortable position at other times."  (Id.)  He stated that Plaintiff "can maintain a fixed head position for 15 to 30 minutes at a time" but could only do so "occasionally."  (Id.)  Plaintiff's counsel specifically declined the ALJ's invitation to question Dr. Landau, who then left.  (Id.)

Corrine Porter appeared and testified at the hearing as a VE.  (AR 51-60.)  The ALJ presented a hypothetical person closely approaching advanced age and possessing a high-school education and Plaintiff's work history.  (AR 53.)  That person was limited to lifting up to 20 pounds occasionally and 10 pounds frequently;

1  sitting for six hours in an eight-hour day, with one to three
2  minutes of standing and stretching per hour; standing and walking
3  for 15 to 30 minutes at a time and up to two hours in an eight-
4  hour day; standing and walking only on even surfaces; climbing
5  stairs but not using ladders, working at heights, or balancing;
6  occasionally stooping and bending; occasionally working above
7  shoulder level and operating food pedals and controls on the
8  left; occasionally moving the neck but with no extremes of
9  motion; maintaining a comfortable neck position at other times;
10 and occasionally maintaining a fixed head position for 15 to 30
11 minutes at a time.  (AR 53-54.)

12      The VE confirmed that such a person could not perform
13 Plaintiff's past work, which had been performed at a medium
14 level.  (AR 54.)  She testified that as she understood the
15 hypothetical, the restrictions on neck motion would preclude such
16 light-range jobs as sewing-machine operator and electronics
17 worker because both required downward neck motion.  (AR 55.)  She
18 requested clarification regarding the limitations upon the
19 hypothetical person's neck motion.  (Id.)  The ALJ reviewed all
20 of Dr. Landau's neck-motion restrictions and emphasized the
21 doctor's opinion that Plaintiff was capable of "occasional neck
22 motion, however you best interpret that."  (Id.)  He stated that
23 he "interpret[ed] that as more general . . . normal movement of
24 the head."  (Id.)  The ALJ then repeated Dr. Landau's findings
25 that Plaintiff's neck "should be held in a comfortable position,"
26 "in a fixed position 15 to 30 minutes at a time only
27 occasionally," with no "extremes of motion."  (Id.)

28      The VE then found that the hypothetical person could perform

30

light-range work as an electronics worker, cashier, or sewing-machine operator.  (AR 56.)  The VE noted that because the hypothetical person was limited to standing or walking only two hours in an eight-hour day, she would be unable to be employed at 90% of available cashier positions.  (Id.)

Plaintiff's counsel specifically said that she had no questions for the VE but wanted to state "for the record" that the jobs identified by the VE "would require more than occasional neck motion" and that the definition of "neck motion" remained unclear.  (Id.)  Counsel further noted that both sewing-machine operator and electronics worker were "fast-paced, production driven kinds of positions."  (Id.)  The VE confirmed as much with respect to the sewing-machine operator but noted that counsel's classification applied "to a lesser degree" to the electronics-worker position.  (Id.)  When the ALJ again encouraged counsel to question the VE, she stated, "But I really don't want to question it, I just want to put it on the record."  (AR 58.)  The ALJ then inquired further, and the VE testified that the electronics-worker job did not involve "moving [the neck] all around" but rather a "slight" downward gaze.  (AR 59.)

E.   ALJ's Decision

In his April 29, 2011 decision, the ALJ found that Plaintiff had severe impairments of morbid obesity with treated obstructive sleep apnea, degenerative joint disease of the left foot and knee, chronic sprain of the left shoulder, degenerative disc disease and degenerative arthritis of the neck and back, and headaches.  (AR 21.)  He determined that her hypertension and mood disorder were not severe.  (AR 22.)

The ALJ determined that Plaintiff retained the RFC to perform "a range of light work":[35]

> [T]he claimant could lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for six hours out of an eight-hour workday, with normal breaks such as every two hours, with the provision to stand and stretch as needed for one to three minutes every hour; stand and/or walk for two hours out of an eight-hour workday, 15 to 30 minutes at a time; and occasionally stoop and bend. The claimant is precluded from uneven surfaces; and climbing ladders, working at heights or balance. The claimant could perform occasional work above shoulder level on the left and with no restrictions on the right. The claimant could perform occasional operation of foot pedals and controls on the left with no restrictions on the right. The claimant can perform occasional neck motion, but should avoid extremes of motions. The claimant's head should be held in a comfortable position at other times. The claimant can maintain a fixed head position for 15 to 30 minutes at a time occasionally.

(AR 24.)

---

[35]   "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." §§ 404.1567(b), 416.967(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id. "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." Id.

1    In so finding, the ALJ considered all Plaintiff's symptoms
2    and found that her "allegations concerning the intensity,
3    persistence and limiting effects of her symptoms are less than
4    fully credible" to the extent they were inconsistent with the
5    objective medical evidence.  (AR 25.)  The ALJ found that
6    Plaintiff's "somewhat normal level of daily activity and
7    interaction," which included driving, shopping, cooking,
8    cleaning, and caring for her grandson, further diminished the
9    credibility of her allegations.  (AR 25-26.)

10    The ALJ gave "great weight" to Dr. Landau's testimony,
11    noting that he "is a specialist in internal medicine and
12    cardiovascular diseases, he has an awareness of all the medical
13    evidence in the record, was present at the hearing to question
14    the claimant and to hear her testimony, and understands Social
15    Security disability programs and requirements."  (AR 29.)  The
16    ALJ emphasized that "[m]ost importantly," Dr. Landau's opinion
17    was "reasonable and consistent with the objective medical
18    evidence."  (Id.)  The ALJ thus found him "highly credible."  (AR
19    28.)

20    The ALJ accorded "less weight" to chiropractor Gonzales's
21    assessment of Plaintiff's diminished range of motion, strength,
22    and capabilities.  (Id.)  Although the ALJ found Gonzales's
23    assessment to be "not totally inconsistent" with the ALJ's own
24    findings, he discounted the report because it was prepared in the
25    context of a workers' compensation claim and was not from an
26    acceptable medical source.  (Id.)  The ALJ similarly gave "less
27    weight" to chiropractor Agazaryan's assessment, noting that it
28    was "without substantial support from any objective clinical or

diagnostic findings," inconsistent with the claimant's admitted
daily activities, and not from an acceptable medical source.[36]
(Id.)

The ALJ found the Work Restriction Status reports
inapplicable to the extent they deemed Plaintiff "temporarily
totally disabled" because that finding is not relevant to an
application under the Social Security Act. (AR 28-29.)  He
considered the objective evidence used to support the
assessments, however, and found it consistent with his
determination that Plaintiff could do light work with
limitations. (AR 29.)  He found the off-work authorizations
completed by Plaintiff's chiropractors to lack probative value.
(Id.)

The ALJ considered but did not give great weight to the
assessments of the orthopedic consultative examiner and state
medical consultants, who generally found fewer restrictions on
Plaintiff's ability to work than Dr. Landau.  (Id.)  He found Dr.
Landau's opinion more consistent with the evidence, including
evidence unavailable to the medical consultants.  (Id.)  He
further found that the state medical consultants did not
adequately consider Plaintiff's subjective complaints.  (Id.)

The ALJ found Plaintiff's RFC insufficient to enable her to
perform her past relevant work. (AR 29-30.)  Given Plaintiff's
age, education, work experience, and RFC, he found that jobs

---

[36]    The ALJ mistakenly noted that the report was completed
by Arbi Mirzaians.  (AR 28.)  Although Mirzaians's name is on the
letterhead, the report is signed by chiropractor Agazaryan and
certified Functional Capacity Technician Basurto.  (See AR 426,
445.)

"exist[ed] in significant numbers in the national economy that the claimant can perform." (AR 30-31.) Specifically, citing the VE's testimony, the ALJ found that Plaintiff could perform such jobs as electronics worker, cashier, and sewing-machine operator. (AR 31.) The ALJ therefore held that Plaintiff was not under a disability from the alleged onset date of July 28, 2008, through the date of his decision. (Id.)

**VI.  DISCUSSION**

Plaintiff alleges that the ALJ provided an incomplete hypothetical to the VE, that the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"), and that the ALJ failed to properly assess the jobs available to a person of Plaintiff's limitations.[36] (J. Stip. at 5, 13, 16.)

> A.  <u>The ALJ's Hypothetical Included All Plaintiff's</u>
>     <u>Limitations</u>

Plaintiff contends that the ALJ's misinterpretation of Plaintiff's limitations effectively eliminated some neck-motion restrictions from the VE's consideration. (Id. at 8.) Plaintiff thus asserts that the ALJ's step-five determination was not supported by substantial evidence. (Id. at 10.)

At step five, the Commissioner must show that the claimant can engage in substantial gainful activity other than her past work, a burden he can meet by propounding to a VE a hypothetical based on medical assumptions supported by substantial evidence in the record and reflecting all the claimant's limitations.

---

[36]  Plaintiff stipulates that the ALJ otherwise "fairly and accurately summarized the medical and non-medical evidence of record." (J. Stip. at 4.)

1  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989); Roberts
2  v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  If the ALJ's
3  hypothetical "contain[s] all of the limitations that the ALJ
4  found credible and supported by substantial evidence in the
5  record," the ALJ may properly rely on the testimony the VE gives
6  in response to the hypothetical in formulating an RFC assessment.
7  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  If,
8  however, the hypothetical does not reflect all the claimant's
9  limitations, "then the 'expert's testimony has no evidentiary
10  value to support a finding that the claimant can perform jobs in
11  the national economy.'"  Matthews v. Shalala, 10 F.3d 678, 681
12  (9th Cir. 1993) (quoting DeLorme v. Sullivan, 924 F.2d 841, 850
13  (9th Cir. 1991)).

14      Here, the ALJ's initial hypothetical tracked precisely the
15  RFC assessment provided by Dr. Landau (compare AR 53-54 with AR
16  42-43), whose testimony the ALJ found "highly credible because it
17  was reasonable and consistent with the evidence as a whole" (AR
18  28) and whose opinion he gave "great weight" for the same reasons
19  (AR 29).  Among the limitations identified by Dr. Landau were
20  four specific to Plaintiff's neck: he opined that "[s]he can do
21  occasional neck motion," she "should avoid extremes of [neck]
22  motions," "[h]er head should be held in a comfortable position at
23  other times," and "she can" "occasionally" "maintain a fixed head
24  position for 15 to 30 minutes at a time." (AR 43.)  Plaintiff
25  does not argue that any of these findings were erroneous, and her
26  counsel specifically declined the ALJ's invitation to cross-
27  examine Dr. Landau or ask him any clarifying questions.

28

Although the VE initially testified that available light-work positions, such as sewing-machine operator and electronics worker, "would be precluded" under "my understanding regarding the neck motion" limitation (AR 55) – specifically, the preclusion of extreme motion would not permit maintaining a "downward gaze" (id.) – she subsequently amended her testimony. Specifically, she inquired whether the proscription against extreme neck motion would include a downward gaze (id.), and in response the ALJ reminded her that Dr. Landau limited Plaintiff to "occasional neck motion" and advised the VE,

> So that would mean generally however you best interpret that.  I interpret that as more general, you know, normal movement of the head.

(AR 55-56).  It was entirely appropriate for the ALJ to offer clarification of the hypothetical, particularly given that he essentially simply repeated Dr. Landau's findings.  Cf. Sample v. Schweiker, 694 F.2d 639, 644 (9th Cir. 1982) (determining validity of medical evidence is "uniquely within the ambit of the ALJ," and ALJ's hypothetical is "objectionable only if the assumed facts could not be supported by the record").  This is all the more true because the VE later clarified that, at least as to the electronics worker, only a "slight" downward gaze was required.  (AR 59.)

Nor is Plaintiff correct in contending that the ALJ and then the VE interpreted Dr. Landau's neck-motion limitation to preclude only side-to-side movement, not downward motion.  (See J. Stip. at 8.)  Rather, the VE sought clarification that "neck motion" meant "moving the neck, as opposed to looking at a

37

downward gaze." (AR 55.) After the ALJ repeated Dr. Landau's findings almost verbatim, she explicitly eliminated the job of garment sorter "because of the neck motion." (AR 56.) And she then explicitly confirmed, in response to further inquiry by the ALJ, that Plaintiff's "neck restrictions would still be okay" for the positions of electronics worker, sewing-machine operator, and cashier. (Id.) Further, while Plaintiff's counsel argued at the hearing that these jobs would require "more than occasional neck motion" if neck motion included "right to left" and "up and down" (AR 57), she explicitly rejected the opportunity the ALJ offered her to clarify the VE's testimony through cross-examination. (AR 57-58 (Counsel: "I really don't want to question it, I just want to put it on the record."")); see Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (rejecting challenge to VE's findings when Plaintiff was represented by counsel at hearing yet failed to raise issues with jobs data); Valenzuela v. Colvin, CV 12-0754-MAN, 2013 WL 2285232, at *4 (C.D. Cal. May 23, 2013) (rejecting challenge to VE's job numbers when counsel failed to inquire about jobs at hearing; noting counsel's "obligation to take an active role and to raise issues that may impact the ALJ's decision while the hearing is proceeding so that they can be addressed" (internal quotation marks omitted)). The ALJ, however, did seek confirmation, and the VE testified that a limitation on both "lateral rotation" and "upward and downward gazing" would not preclude the identified jobs. (AR 58-59.)

Nor does Plaintiff proffer any other specific basis for finding the ALJ's statements concerning Dr. Landau's neck-motion limitation unreasonable or incorrect. See Parra, 481 F.3d at 746

1   (reviewing court may set aside ALJ's denial of benefits only when

2   evidence does not reasonably support decision).   Rather,

3   Plaintiff asserts generally that the ALJ "ignored . . . relevant

4   evidence" in determining that Plaintiff's impairments permitted a

5   downward gaze.   (J. Stip. at 9.)   Not only is sorting the

6   evidence the ALJ's unique task, Sample, 694 F.2d at 644, but a

7   court in this district has affirmed an ALJ's finding that a

8   claimant with nearly exactly the same limitations as Plaintiff

9   was able to perform the job of electronics worker.   See Huerta v.

10  Astrue, EDCV 11-1868-MLG, 2012 WL 2865898, at *1 n.1, *2 (C.D.

11  Cal. July 12, 2012) (holding that ALJ reasonably relied on VE

12  testimony that claimant with similar standing and neck

13  limitations could perform occupation of electronics worker).

14  Indeed, the VE's statement that that job involved a "slight"

15  downward gaze can hardly be equated with Dr. Landau's prohibition

16  on "extreme neck motions."

17       Plaintiff has failed to show that the ALJ's hypothetical was

18  incomplete or incorrect.   As such, he was entitled to rely on the

19  VE's responsive testimony as substantial evidence.   See Bayliss,

20  427 F.3d at 1217 (when hypothetical included "all of the

21  limitations that the ALJ found credible and supported by

22  substantial evidence in the record," reliance on VE's testimony

23  in response was proper); see also Johnson v. Shalala, 60 F.3d

24  1428, 1435-36 (9th Cir. 1995) (finding it proper for ALJ to rely

25  on VE's testimony regarding which available jobs claimant could

26  perform).

27       Reversal is not warranted on this basis.

28

B. <u>The ALJ Did Not Err in Finding That the VE's Testimony</u>
   <u>Was Consistent With the DOT</u>

Plaintiff further asserts that the VE's testimony conflicted
with the DOT. (<u>See</u> J. Stip. at 15-16.)  Reversal is not
warranted on this basis.

Plaintiff is correct that the DOT is the best source of
information about how a job is generally performed.  <u>See</u>
<u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1166 (9th
Cir. 2008); <u>see also</u> <u>Johnson</u>, 60 F.3d at 1435; 20 C.F.R. §§
404.1566(d), 416.966(d).  The Ninth Circuit has held that in
order to rely on a VE's testimony regarding the requirements of a
particular job, an ALJ must first inquire whether her testimony
conflicts with the DOT.  <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-
53 (9th Cir. 2007) (citing SSR 00-4p, 2000 WL 1898704, at *4
(Dec. 4, 2000)).  When such a conflict exists, the ALJ may accept
VE testimony that contradicts the DOT only if the record contains
"'persuasive evidence to support the deviation.'"  <u>Pinto v.</u>
<u>Massanari</u>, 249 F.3d 840, 846 (9th Cir. 2001) (quoting <u>Johnson</u>, 60
F.3d at 1435); <u>see also</u> <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1042
(9th Cir. 2008) (error found when "ALJ did not identify what
aspect of the VE's experience warranted deviation from the DOT").

Here, as Plaintiff concedes (J. Stip. at 15), the ALJ
properly inquired whether the VE's testimony was consistent with
the DOT, and she confirmed that it was (AR 57).  Although
Plaintiff contends that the VE's testimony conflicted with the
DOT, she does not identify the source of that conflict. (<u>See</u> J.
Stip. at 15-16.)  As in <u>Huerta</u>, involving a claimant with similar
standing/walking and neck limitations, Plaintiff cites to nothing

40

in the DOT descriptions of the jobs identified by the VE that
conflicts with the VE's testimony.  2012 WL 2865898, at *1 n.1,
*2.  Thus, as in Huerta, it was proper for the ALJ to rely on the
VE's testimony, and his finding that Plaintiff could perform the
occupations identified by the VE was supported by substantial
evidence.  Id. at *2 (citing Johnson, 60 F.3d at 1435-36).

To the extent Plaintiff argues that the conflict lies in the
ALJ's failure to apply the Grids (see J. Stip at 16), her
argument fails.  First, the failure to apply the Grids does not
represent a conflict between the VE's testimony and the DOT but
rather a determination by the ALJ that Plaintiff's limitations
did not match the Grids.  Second, as discussed below, the ALJ
properly determined as much.

C.   The ALJ Adequately Accounted for Erosion of the
     Identified Jobs

Plaintiff further contends that the ALJ erred in failing to
apply the Grids.  (J. Stip. at 4, 13.)  Specifically, Plaintiff
contends that because the ALJ found that she maintained an RFC
for less than light work and the VE testified that the number of
available positions was 90% eroded because of Plaintiff's
additional limitations, the ALJ should have applied the sedentary
Grid.  (J. Stip. at 16.)  Remand is not warranted on this basis.

The Grids are used to determine whether substantial gainful
work exists for a claimant with respect to substantially uniform
levels of impairment.  Thomas v. Barnhart, 278 F.3d 947, 960 (9th
Cir. 2002); see also Moore v. Apfel, 216 F.3d 864, 869 (9th Cir.
2000).  When the Grids do not adequately take into account a
claimant's abilities and limitations, they are to be used only as

41

a framework, and a vocational expert must be consulted.  Thomas, 278 F.3d at 960; Moore, 216 F.3d at 869; see also SSR 83-12, 1983 WL 31253, at *2-3 (Jan. 1, 1983) (when claimant falls between two exertional levels, consultation with VE is appropriate).  In such a case, "the ALJ fulfills his obligation to determine the claimant's occupational base by consulting a vocational expert regarding whether a person with claimant's profile could perform substantial gainful work in the economy."  Thomas, 278 F.3d at 960 (citing Moore, 216 F.3d at 870-71).

Here, the ALJ properly consulted a VE to determine whether Plaintiff could perform substantial gainful work in the economy. Even having calculated 90% erosion to either one or two job bases based on Plaintiff's stand/walk limitation,[37] the VE testified that there existed 500 regional and 8000 national electronics-worker positions, 3000 regional and 70,000 national cashier positions, and 16,000 regional and 190,000 national jobs for sewing-machine operators.  (AR 31, 56.)  The Ninth Circuit has upheld a VE's finding of smaller numbers of available jobs as substantial evidence that a claimant is not disabled.  See Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995) (2300 local and 64,000 national jobs substantial evidence supporting denial of benefits); Barker v. Sec'y of Health & Human Servs., 882 F.2d

_____

[37]    Plaintiff contends that the VE testified that all three positions would be eroded by 90% because of Plaintiff's limitations on standing and walking. (J. Stip. at 14.)  In fact, although the ALJ's decision reflects erosion in available positions for both cashiers and sewing-machine operators (AR 31), the VE testified that only the cashier position would be eroded by Plaintiff's limitation (see AR 56).  In any event, there was no erosion at all in at least one of the jobs.

1474, 1478–79 (9th Cir. 1989) (1266 local jobs was "significant number").

Plaintiff's contention that the ALJ should have applied the Program Operations Manual System ("POMS"), an internal SSA document, ignores that the POMS "does not have the force of law," Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006), and is not binding on the ALJ, see Lockwood v. Comm'r Soc. Sec. Admin., 616 F.3d 1068, 1073 (9th Cir. 2010) ("POMS constitutes an agency interpretation that does not impose judicially enforceable duties on either this court or the ALJ."). Moreover, as the Commissioner notes (J. Stip. at 20), POMS DI 25001.001(B)(72), cited by Plaintiff, does not mandate the use of the sedentary Grid but rather suggests that the ALJ use a lower exertional rule "as a framework" in the case of "[a] considerable reduction in the available occupations at a particular exertional level." See POMS DI 25001.001(B)(72) (Mar. 5, 2013), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001. When, as here, the VE has identified jobs available in significant numbers based on Plaintiff's limitations, POMS DI 25001.001(B)(72) does not apply.

Remand is not warranted.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[38] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this

---

[38] This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

action with prejudice.   IT IS FURTHER ORDERED that the Clerk
serve copies of this Order and the Judgment on counsel for both
parties.


DATED: January 9, 2014

JEAN ROSENBLUTH
U.S. Magistrate Judge